## MUTUAL BEN. HEALTH & ACCIDENT ASS'N v. LYON.

### No. 10982.

Circuit Court of Appeals, Eighth Circuit.

March 19, 1938.

Rehearing Denied April 11, 1938.

G. Byron Dobbs, of Fort Smith, Ark. (Thomas B. Pryor and Thomas B. Pryor,

Jr., both of Fort Smith, Ark., on the brief), for appellant.

John W. Nance, of McAllen, Tex., for appellee.

Before STONE, GARDNER, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is to reverse a judgment for plaintiff in a suit upon an insurance policy.

It appears that on December 31, 1926, the Mutual Benefit Health & Accident Insurance Association issued its policy insuring the plaintiff's husband, William R. Lyon, against accidental death (and other hazards, including sickness) in pursuance to an application in writing signed by him and made part of the insurance contract. The application was in question and answer form, and in response to the question, "What is the premium?" the answer was: "$16.00 quarterly." It appears that premium payments of $16 were made each and every quarter after the issuance of the policy up to and including April 1, 1934, and it is not disputed that the insurance was thereby kept in force until July 1, 1934. But no further payment of premium was made on or before said first day of July, 1934. Mr. Lyon suffered death from bodily injuries sustained through purely accidental means within the meaning of the policy on July 19, 1934, and the association having refused payment after proof of loss, the widow, who is the beneficiary in the policy, brought this action at law, praying recovery upon the policy for the total amount therein provided for accidental death, increased as specified in the policy because it had been continued in force seven years. The jurisdictional amount was involved and diversity of citizenship existed.

It was alleged in the amended complaint upon which the case was tried that the insured had paid all premiums and had fully performed the conditions and requirements of the policy, and that it was in full force and effect at the time of the accidental death of the insured, and there were further allegations as follows:

"By the terms of provision 'C' aforesaid, the defendant company attempted to provide that said premiums must be paid at the home office in Omaha, Nebraska, on the day same became due and payable, but plaintiff alleges that the defendant appointed an agent in the City of Rogers, Arkansas, designated by the defendant as its local treasurer to collect premiums from the insured and other policy holders, with apparent authority to waive the time for payment of premiums and that said local treasurer by long continued practice, without objection upon the part of the defendant company, established the custom of receiving premiums out of time, and it was for a long period of years customary for said local treasurer to receive payment of premiums from the insured at any time it was most convenient for the insured to make such payments, and the defendant thereby waived its right to declare a forfeiture of the rights of the insured under said policy, because of failure to pay said premiums at the home office in Omaha, Nebraska, on the day same became due and payable.

"That on and prior to the first day of January, 1934, one Roy E. Hamilton was the authorized and acting agent and local treasurer of the defendant company in the city of Rogers, Arkansas, duly authorized to collect premiums from the insured and other policy holders, and had been acting in such capacity for the defendant company for a period of more than five years; that the insured had been accustomed to pay his premiums to said agent during all of said time; that by the terms of said policy of insurance the defendant company was required to give the insured notice of the time said premiums were due and payable; that the defendant company, without any notice to the insured, changed its method of collecting premiums and required same to be paid in the city of Little Rock, Arkansas, and that said premiums be sent by mail to an agent of the defendant company in said city of Little Rock, instead of being paid to said local treasurer; that on the first day of July, 1934, the plaintiff, acting as agent for the insured, attempted to pay said premium to the said local treasurer of the defendant company; that said plaintiff was unable to locate said agent for several days, but finally on the 6th day of July, 1934, plaintiff located said agent and was by him informed that the custom of paying the premiums had been changed and that payment should be made to the defendant's agent in the city of Little Rock, Arkansas; that the plaintiff, acting as agent for the insured, went immediately to the United

States Postoffice in said city of Rogers and purchased a postal money order for the sum of $16.00, made payable to the defendant, and [deposted] same in the post-office, properly addressed to the defendant, which was in due time received by the defendant; that the defendant refused to accept payment of said premium on the ground that it was not paid on the first day of July, 1934, and the defendant now claims a forfeiture of said policy of insurance on the ground that said premium was not paid on said first day of July. The plaintiff alleges that the defendant was without right to claim and declare a forfeiture of said policy for the non-payment of said premium on said first day of July for the following reasons, to-wit:

"First: That defendant had failed and neglected to give the insured notice of the time said premium was due and payable as required by the terms of said policy.

"Second: That the defendant, by its acts and conduct in establishing a custom of receiving payment of premiums out of time and of changing the method of payment from that provided in the policy had waived its right to declare a forfeiture for non-payment of said premium on said first day of July.

"Third: That said premium had been previously paid and therefore was not due and payable on said first day of July and the insured was not liable for payment of same at said time.

"That it is provided in part (C) of said policy of insurance as follows, to wit:

" 'After the first year's premium has been paid, each year's renewal of this policy shall add $200.00 to the death benefit until the same amounts to $4000.00.' "

"That after the payment of the first year's premium said policy of insurance was renewed each year, beginning with the first day of January, 1928, and including renewals for each year thereafter to and including the year 1933, making six annual renewals, which entitled the plaintiff to the sum of $200.00 for each renewal, in the total sum of $1200.00.

"That in a rider attached to said policy it is provided as follows:

" 'In event of the accidental death of the insured under the provisions of this policy, providing this policy has been in force for one year, the company agrees to pay in addition to the amount otherwise payable, an amount equal to all of the premiums paid by the insured on this policy, plus compound interest at the rate of 4% per annum from the date of the payment of each of said premiums to the date of death of the insured.' "

"That the insured paid all premiums due thereon in the sum of $464.00, and an additional sum of $48.00; that under said clause plaintiff is entitled to recover the sum of $478.00, including interest at the rate of 4% annually.

"That the plaintiff is entitled to recover of and from the defendant company benefits in the total sum of $3678.00."

A true copy of the policy sued on was attached to the amended complaint.

The answer of the association contained specific denials, but admitted the execution and delivery of the policy and that the insured lost his life from accidental causes on July 19, 1934. It was alleged that the 1st day of July, 1934, was the last day to which premium had been paid in advance and that the policy expired by its own terms on that date, and that under the provisions of the insurance contract the association had the right to refuse to extend the insurance for any period of time beyond the period for which the premium had been paid in advance, and that it did refuse to insure for any additional period of time beyond the 1st day of July, 1934. The association "denies that the defendant by its acts and conduct established a custom of receiving payments of premiums out of time; denies that it changed the method of payment from that provided in the policy, and denies that it waived its right to declare a forfeiture for the nonpayment of said premium on the 1st day of July, and specifically denies that said premium had been previously paid and, therefore, was not due and payable on said 1st day of July."

It was further pleaded that the following provisions of the policy presented a bar to recovery by the plaintiff:

"The term of this policy begins at twelve o'clock noon, standard time, on date of issue * * * and ends at twelve o'clock noon on date renewal is due."

" * * * The acceptance of any premium on this policy shall be optional with the Association, * * *"

On the trial of the case the plaintiff testified that she was present with her husband when the insurance was obtained and a liberal interpretation of part of her testimony made by her counsel was:

"During the negotiations with the local agent, in which both insured and the plaintiff participated, it was discovered that the premiums were to be paid upon a specific date and that no days of grace were allowed; that if premiums were not paid on the date specified, the policy would lapse and insured would forfeit the insurance. They objected to that feature for the reason stated, that there might be times when insured would be out of employment and consequently be unable to meet premium payments on time. To obviate this objection, the agent recommended that they pay a full year's premium in advance and then go on with quarterly premiums in the regular way, and by that means insured would always have his premiums paid-up far enough in advance to bridge him over any unforeseen inability to pay on time, and thus the insured was induced to pay the first year's premium in advance and he elected to pay subsequent annual premiums in quarterly installments, beginning on the first day of April, 1927, which was expiration date of the first quarter after the policy was issued. The payment of the first year's premium in the sum of $74.00 was made to the agent and the policy was thereupon delivered to the insured."

The plaintiff also testified that as agent for her husband she continued to make quarterly payments upon the policy and never missed a payment up to and including the payment of April 1, 1934, which carried the insurance to July 1, 1934. She made that last payment by postal money order mailed by her to the branch office of the association at Little Rock, Arkansas, and it was there received and receipted for by the association. Mrs. Lyon also stated that she had complained to the local collecting agent of the association about his being out of the office and delaying her payments and that he had said to her: "Now, Mrs. Lyon, don't you worry about that. Anybody that I know is good for these premiums I make out the receipt on the first of the month, anyway, and then when you are down town sometime, and I am in the office or it is convenient, you can step in and pay me." That she made the payments that way, paid them just any place she could catch him and at any time that it was convenient; that most of the time it would be the first of the month when the money would come; and that she would always take it and pay Mr. Hamilton. The question was put to her, "The question is, were you delayed and made your payment after the first of the month?" And she answered: "Yes, sir, several times."

On the 1st day of July, 1934, plaintiff appeared at the office of the collector for the association at Rogers, Arkansas, but was unable to find him then or at any time until July 5th when he told her to send the premium for the policy to Little Rock. She complied with his suggestion on the next day by mailing a money order in the correct amount to the association there. The association received the money order but mailed it back to the assured with the following letter:

"Dear Mr. Lyon:

"You will find inclosed the money order in the amount of $16.00, which you sent us to reinstate your policy #60J-20343, and we regret that it will not be possible for us to accept this payment as the Home Office did not send us an official receipt for you.

"We note that you are past the age of sixty years, but we are today writing our Home Office, and asking if it will be possible to make an exception in your case, and allow you to continue keeping your policy in force with the Thirty Day Elimination Endorsement attached. Kindly advise if you would desire to keep your policy in force if our Home Office will attach a Thirty Day Elimination Endorsement. This endorsement will mean that you will not be paid any benefits during the first thirty days of any period of disability, but should you be disable[d] over a long period of time, you would have the same protection as you previously had, starting on the 31st day.

"Just as soon as we receive a reply from our Home Office, we will write you, and we are enclosing a self-addressed envelope for your convenience in advising us if you would desire to keep your policy in force with the endorsement attached."

When this letter from the association was delivered at her home, Mrs. Lyon

was away on a visit and on her return home word came to her of her husband's death before she opened the letter. Mrs. Lyon produced and the court received in evidence all of the quarterly premium receipts which had been issued by the association except one for the last quarter of 1927 and one of the first quarter of 1929. For both of these Mrs. Lyon had her canceled checks in the amount of $16 each paid to the agent of the association. Each of the receipts issued by the association contained the declaration that the "payment of this premium receipted for * * * keeps your policy in continuous effect * * * until 12 o'clock noon standard time [of a day specified exactly three months later than the receipt date] at which time another payment will be due."

Mrs. Lyon was the sole witness. Upon the conclusion of her testimony the association indicated that it did not desire to put on any evidence but moved for an instructed verdict in its favor. The motion was overruled and exceptions to the ruling were preserved. There was a verdict for the plaintiff under the court's direction and judgment thereon, and upon this appeal the contentions are presented:

(1) That the insurance involved was term insurance only for the term for which premium was paid in advance; that acceptance of any premium was optional with the association and it exercised its option and rejected the premium tendered after July 1, 1934. And (2) that there was no competent or substantial evidence to sustain plaintiff's allegation that the insured had paid all premiums and kept the policy in force and effect at the time of death.

1. It is not contended that the sick benefit provisions of the policy in suit which prevent the association from canceling the insurance during any period of disability of the insured are applicable to the situation here presented. Here the claim is solely for the amounts payable under the policy for accidental death. But counsel for plaintiff points to the provisions of the policy whereby the amounts payable for accidental death are substantially increased upon each year's renewal of the policy after the first year's premium has been paid. If such accidental death occurs during the first year while the policy is in force, only $2000 is payable, but annual increase of $200 per year is promised until the amount of insurance for accidental death reaches $4000 after twenty full years' premiums have been paid, and thereafter the accidental death benefit of $4000 may be continued at a small yearly cost. Furthermore, a rider upon the policy promises that after the policy has been in force one year an additional amount, equal to all the premiums that have been paid plus compound interest thereon, shall be added to the amount of insurance for accidental death otherwise provided in the policy.

It has been ably contended that these provisions of the policy worked such a change in the insurance that it ceased to be term insurance and became in effect assimilated to life time insurance, terminable like life insurance only upon notice for failure to pay premiums after full opportunity to pay had been given. It is argued that under these provisions an insured builds up an increasing interest of value in the policy and that it would be harsh to let him be deprived of such increase at the option of the association. But we are not persuaded that the promise to make the additions to the accidental death benefits if the policy should be continued, changes the nature of the insurance. It is observed that the increases in the amounts promised by the policy do not apply to the numerous other hazards covered but only to loss by accidental death, and it is not contended that the increase would cause the insurance to become unprofitable to the association or that there was any fraud in the transaction. The practice of including similar promises in accident insurance policies is not uncommon and we are not cited to any case which supports the contention that such increase of benefits works a change in the nature of the insurance. The policy very clearly provides that its term begins at 12 o'clock noon on the date of issue and ends at 12 o'clock noon on date renewal is due, and each and every receipt issued to and accepted and retained by the insured reiterated that the payment receipted for kept the insurance in force until 12 o'clock noon of the specifically named first day of the next quarter. And the declaration of the clause (c) of the policy that "the acceptance of any premium on this policy shall be optional with the association," is equally unequivocal

(notwithstanding other provisions found in the same clause.[1]) We think the terms of the policy reserved to the association the right to refuse renewal of the policy on July 1, 1934.

 2. As to the claim that the policy was paid up to the time of death. We consider first Mrs. Lyon's testimony concerning the oral agreement between her deceased husband and the agent of the association, also deceased, at the time of the trial. By the terms of that oral agreement the association was to receive from the insured and keep a sum equal to three quarterly premiums ($48), and if at any time thereafter Mr. Lyon should fail to pay any quarterly payment the association was to apply $16 out of the $48 to such payment and so keep the insurance in effect.

We observe that the policy provided: "This policy * * * contains the entire contract of insurance," and "no agent has authority to change this policy or to waive any of its provisions. No change in this policy shall be valid unless approved by an executive officer of the association and such approval be endorsed hereon."

We think it clear that Mrs. Lyon's testimony as to her husband's oral arrangement with the deceased agent of the association was incompetent to change or extend the insurance contract sued on. The term character of the insurance and its expiration dates were definitely fixed by the policy and by the renewal receipts issued to and retained by the insured every three months for more than seven years. The policy provisions prevent recovery upon oral testimony of agreement with the local agent that the insurance was not to end as prescribed in the policy at "noon on the date renewal was due," or that the association was to continue the insurance contrary to the option reserved to it by the policy. Gill v. Mutual Life Insurance Co., 8 Cir., 63 F.2d 967, loc. cit. 970, 971; Kithcart v. Metropolitan Life Insurance Co., 8 Cir., 88 F.2d 407, loc. cit. 410.

In the latter case the court said: "The contract between plaintiff and defendant upon which the law action was predicated was a written contract, and what might have been said to plaintiff by a mere solicitor would not have been binding upon the insurance company in the face of the provisions in its policy." The court held that provisions similar to those in the policy at bar constituted "a direct limitation upon the authority of any soliciting agent to bind the company by oral conversations outside of the written terms of the policy and the application." Mutual Life Insurance Co. of New York v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202; New York Life Insurance Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934; New York Life Insurance Co. v. McCreary, 8 Cir., 60 F.2d 355.

██ But the plaintiff also put reliance upon a provision of the policy itself referred to as "additional provision (C)." That is the only clause of the policy which indicates the price at which the insurance was issued and in which the amount of the premium required to be paid is set forth. It reads:

"(c) The copy of the application indorsed hereon is hereby made a part of this contract and this policy is issued in consideration of the statements made by the Insured in the application and the payment in advance of ($74.00) Dollars the first year; and the payment in advance of premiums of ($64.00) Dollars annually or ($16.00) Dollars quarterly thereafter, beginning with April 1, 1927, is required to keep this policy in continuous effect. If any such dues be unpaid at the office of the Association in Omaha, Nebraska, this policy shall terminate on the day such payment is due. The mailing of notice to the Insured at least fifteen days prior to the date they are due shall constitute legal notice of dues."

On casual inspection the reference in the clause to the "payment in advance of $74.00" might seem to imply an acknowledgment by the association that it had received a payment in advance for a year in the said sum of $74, but more careful consideration of the contract convinces that the association did not intend to and did not declare or acknowledge anywhere in the writing that it had actually received such sum or that it had received a year's premium. The meaning of the words of the policy taken in connection with the application for the policy

---

[1] "The acceptance of any premium on this policy shall be optional with the Association, and should the premium provided for herein be insufficient to meet the requirements of this policy, the Association may call for the difference as required."

is that the insurance was payable in advance and that the rate was $74 per annum for the first year and $64 per annum thereafter; that the insured elected to pay for the insurance in payments of $16 per quarter and that the date April 1, 1927, written into the form was the date upon which the first paid up term expired and when the first renewal was due. The declaration of the application that the premium for the policy was $16 quarterly, taken with the provision of the clause (c) that payment of $16 quarterly beginning with April 1, 1927, was required to keep the policy in effect, and with the statement in the application that the premium was payable quarterly manifest the intent of the parties to contract for insurance on the quarterly payment plan. The insured began making quarterly payments of $16 immediately before the date April 1, 1927, and kept them up each quarter for years, and that is what the parties meant and intended should be done.

The policy evidenced a contract of term insurance which the association had a right to discontinue at any date when renewal was due. By its letter refusing a renewal receipt and returning the postal money order it did terminate the policy. The proposal to enter into a different contract was not acted upon. The term of insurance was ended prior to the accident.

Reversed and remanded.

STONE, Circuit Judge (separate opinion).

I concur in the result reached in the majority opinion that this case should be reversed. I am unable to concur with the grounds stated therein for reversal.

I think the case should be reversed because of error in the peremptory instruction in favor of plaintiff. It seems to me that whether the insured had paid three-quarters of a year in advance, as testified to by plaintiff, was a matter for determination by the jury.

It seems to me that there is enough in the policy itself to justify the position of the plaintiff that there had been a payment in advance of enough money to carry this policy past the date of death. The provision in the policy which seems to me to carry this meaning is "additional provision (c)," which is set forth in the majority opinion.

When the entire policy, including the application, is considered, there can be no doubt that the annual premium on this policy was $64, to be paid in quarterly amounts of $16 each, and that such quarterly premiums were payable in advance. With these provisions as to premium and payment beyond question, the other provisions in the first sentence of (c) seem to me of determining importance. Those provisions must be read in the light of the fact that this insurance was issued and became effective December 31, 1926.

At the above date provision (c) declared that "this policy is issued in consideration of the statements made by the insured in the application and the payment in advance of ($74.00) Dollars the first year; and the payment in advance of premiums of ($64.00) Dollars annually or ($16.00) Dollars quarterly thereafter beginning with April 1, 1927, is required to keep this policy in continuous effect." On its face this statement is rather puzzling and, apparently contradictory. First it states the consideration for the issuance of the policy to be the statements in the application "and the payment in advance of ($74.00) Dollars the first year." This statement alone would clearly mean that the premium for the first year was to be paid in advance in the amount stated. The following part of the sentence sets forth that "to keep this policy in continuous effect" it is necessary to make "payment in advance of premiums of ($64.00) Dollars annually or ($16.00) Dollars quarterly thereafter, beginning with April 1, 1927." Thus the apparently anomalous situation is presented of a requirement of an advance payment of $74 covering the first year premium for a year which would begin December 31, 1926, and the requirement of a yearly premium of $64 or quarterly payments of $16.00 "beginning with April 1, 1927," which is only three months after the policy is issued.

It seems to me the above situation is so anomalous and ambiguous that it requires evidence to make it clear. It will not do to brush aside either the requirement of advance payment of $74 for the first year or the payments of $64 (or $16 quarterly) beginning with April 1, 1927. Each of these is a requirement of the policy itself. Plaintiff offered evidence explaining this apparent anomaly. It seems to me that her explanation, if true, is satisfactory. It makes these provisions of the policy understandable and removes the ambiguity or conflict arising from them.

Also, I do not think it of determining importance that the policy itself does not acknowledge receipt of the $74. In this respect the only inquiry is whether that amount was paid. If it was paid the policy itself shows what it was paid for. The testimony of plaintiff was positive and direct that it had been paid.

Thus we have the situation of undisputed payments of $16 a quarter beginning April 1, 1927, up to and including April 1, 1934. We have the testimony of plaintiff that $74 was paid at the time the policy issued. We have the requirement in the policy that $74 be paid in advance and that this payment was for "the first year" which began December 31, 1926. We have the situation that there is no contention that any amount was paid at the time of issuance of the policy except that made by the plaintiff, which is that $74 was then paid, from which it follows that unless that amount was paid there was no payment whatsoever for the insurance from its date of issue to April 1, 1927. Nowhere in the policy can there be found any semblance of a reason to believe that deceased was to receive three months of insurance without payment of premium. I am unable to escape the conclusion that the policy itself contains provisions which require explanation and that plaintiff was entitled to the judgment of the jury on the verity of the explanation to which she testified.